STATE of Wisconsin, Plaintiff-Respondent,

v.

Winston B. EISON, Defendant-Appellant.†

Court of Appeals

*Nos. 93–3144–CR, 93–3145–CR, 93–3146–CR, 93–3147–CR.
Submitted on briefs September 1, 1994.—Decided October 11,
1994.*

(Also reported in 525 N.W.2d 91.)

†Petition to review granted.

For the defendant-appellant the cause was submitted on the briefs of *Scott B. Taylor* of *Lucas & Wilkoski* of West Allis.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general and *Thomas J. Balistreri*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

WEDEMEYER, P.J. Winston B. Eison appeals from judgments of conviction.[1] Eison was convicted, after a jury trial, of obstructing an officer, two counts of armed robbery, and possession of a firearm by a felon. Eison also pled guilty to burglary and carrying a concealed weapon. Eison claims that he is entitled to a new trial based on juror experimentation during deliberations. He is appealing all of the convictions, claiming that the sentences from the guilty plea convictions are intertwined with the jury convictions and, therefore, all must be vacated and remanded. Because we conclude that the only extraneous information that reached the jury's attention did not raise a reasonable possibility of prejudicial effect on a hypothetical average jury, we affirm.

## I. BACKGROUND

On February 21, 1992, Larry D. Fielder was robbed at gunpoint as he exited his garage and was walking toward his house. Fielder identified Eison from a police line-up, and testified at trial that he recognized Eison immediately because of the round shape of his face, the unshaven area around his face, and his close-set eyes. Fielder testified that he became "[t]otally certain" of his identification when he recognized Eison's distinctive voice. Fielder testified that there was sufficient illumination from the street light

---

[1] Eison's notice of appeal also states that he appeals from an order denying his motion for post-conviction relief. Although the trial court orally denied Eison's post-conviction motion on November 10, 1993, a formal order was never entered; nevertheless, in ruling on this appeal, we will consider those issues raised by Eison at the post-conviction motion hearing.

to allow him to get a "very good look" at Eison's face and that he was able to discern that Eison wore a hood that was pulled tightly. Fielder also testified that Eison had a silver, automatic pistol, but he could not say with any certainty whether the gun had a chrome finish. He testified that if he had to guess, he would say the finish was nickel-plated or brushed.

On February 24, 1992, Mark Lonteen, who worked for Pizza Hut, attempted to deliver pizzas to an apartment building when he was confronted by an individual whom he later identified as Eison. Lonteen testified that Eison pulled out a shiny, silver gun and told Lonteen to leave the pizzas and any money he had. Lonteen testified that this encounter lasted between six and nine minutes, and he saw the robber's face clearly in the light, even though the robber wore a hood tightly around his head. Lonteen was "very certain" of his identification.

On February 27, 1992, Police Officer James Ortiz saw an individual hiding in some bushes on the same block where Lonteen was robbed. Ortiz testified at trial that this person turned out to be Eison and that he was in possession of a chrome-plated semi-automatic .22 caliber handgun.

Shortly after the jury trial, Eison discovered two incidents which occurred during deliberations that he claims constitute improper jury experimentation. During deliberations, one juror was asked to put on the hood of his sweatshirt and pull it tightly, presumably so the other jurors could discern what facial features were identifiable. In addition, another juror brought in two wrenches from home, one with a chrome finish and one with a stainless steel finish. The jury turned the lights off to see whether the color of the wrenches was visible in the dark.

Eison filed sworn affidavits from six of the twelve jurors in support of his post-verdict motion for a new trial. All of the affidavits recount both incidents described above. Both sides agreed to have the trial court decide the post-verdict motion based on these affidavits alone, without taking testimony from any of the jurors and without an examination of the wrenches. The trial court found that neither instance prejudiced the outcome and denied Eison's motion. Eison appeals.

## II. DISCUSSION

In determining whether to overturn a verdict and grant a new trial because of juror misconduct, the trial court must first determine whether the jurors are competent to testify regarding the validity of the verdict. *Castaneda v. Pederson*, 185 Wis. 2d 200, 209, 518 N.W.2d 246, 249-50 (1994). In order to promote verdict finality and maintain the integrity of the jury as a decision-making body, jurors cannot testify regarding statements made during deliberations and cannot testify regarding the deliberative process that took place in reaching a verdict. *See* § 906.06(2), STATS.; *State v. Shillcutt*, 119 Wis. 2d 788, 793-94, 350 N.W.2d 686, 689 (1984). Section 906.06(2) provides an exception to this rule, allowing jurors to testify "on the question [of] whether extraneous prejudicial information was improperly brought to the jury's attention." The party seeking to impeach the verdict has the burden of proving that a juror's testimony is admissible by establishing: (1) "that the juror's testimony concerns extraneous information (rather than the deliberative processes of the jurors)," (2) "that the extraneous information was improperly brought to the jury's attention,"

and (3) "that the extraneous information was potentially prejudicial." *State v. Poh*, 116 Wis. 2d 510, 520, 343 N.W.2d 108, 114 (1984).

█

If a party satisfies this burden, the juror's testimony is deemed admissible; however, to overturn the verdict, the party must also prove by clear, satisfactory and convincing evidence that there is a reasonable possibility that the extraneous information would prejudice a hypothetical average jury. *State v. Messelt*, 185 Wis. 2d 255, 282-83, 518 N.W.2d 232, 243 (1994).

*A. The Hood Experiment.*

First, we address the "hood experiment." The first step in the analysis delineated above is to determine whether the juror's testimony regarding the hood experiment concerns extraneous information or the deliberative processes of the jurors. All six juror affidavits indicated that one juror, who happened to be wearing a sweatshirt with a hood, was asked to put the hood on and pull it tightly to see what facial characteristics could be identified. The record indicates that the juror did not deliberately bring a hooded sweatshirt from home for the purposes of conducting this experiment. The juror just happened to be wearing a hooded sweatshirt. We find this fact to be particularly significant in determining whether this incident constitutes extraneous information.

█

Jurors, in all likelihood, will frequently refer to their own bodies, and the clothing each juror may happen to be wearing, when trying to recreate what has been described in a courtroom. This is the type of give-and-take discussion that we cannot remove from the deliberation process because we cannot "sterilize" the

305

jury to be free from all external factors. *Poh*, 116 Wis. 2d at 518 n.6, 343 N.W.2d at 113 n.6. Moreover, "[j]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict." *Simon v. Kuhlman*, 549 F. Supp. 1202, 1207-08 (S.D.N.Y. 1982). As a result, we cannot prohibit juries from attempting to recreate the circumstances described in the testimony during their deliberations in an effort to reach a verdict.

■ Courts have routinely refused to overturn a verdict where the jury attempted to simulate the described disguise of the defendant. *See, e.g., United States v. Hephner*, 410 F.2d 930, 936 (7th Cir. 1969) (juror covered head and wore sunglasses as robber allegedly did); *United States v. Welch*, 496 F.2d 861, 861 (4th Cir.) (juror used adhesive tape to disguise face as robber allegedly did), *cert. denied*, 419 U.S. 857 (1974); *Simon*, 549 F. Supp. at 1204-08 (black male juror put stocking over his head as black male defendant allegedly did). The "hood experiment" was an inherent part of the deliberative process. As a result, we conclude that this incident did not constitute extraneous information.

We conclude, therefore, that jurors' testimony, via the affidavits, regarding the "hood experiment" is not competent because it concerns the deliberative processes of the jurors. Therefore, we need not address the remaining steps in the analysis with respect to this incident because the jury verdict cannot be impeached and a new trial cannot be granted on this basis. *See State v. Casey*, 166 Wis. 2d 341, 346, 479 N.W.2d 251, 253 (Ct. App. 1991) (a determination that the evidence

is incompetent renders it inadmissible and ends the inquiry into the validity of a verdict).

*B. The Wrench Experiment.*

■

Next, we address the wrench experiment employing the same analysis. All six juror affidavits indicate that one juror brought with her from home two wrenches and showed these wrenches to the jury during deliberations for a color comparison. First, we consider whether the testimony regarding the wrenches is extraneous information or deliberative processes of the jury. " 'Extraneous information' is information which a juror obtains from a non-evidentiary source, other than the 'general wisdom' we expect jurors to possess." *Messelt*, 185 Wis. 2d at 276, 518 N.W.2d at 241 (quoting *Poh*, 116 Wis. 2d at 521, 343 N.W.2d at 115). "It is information 'coming from the outside.' " *Messelt*, 185 Wis. 2d at 276, 518 N.W.2d at 241. Clearly, in this case, the wrenches were "information from the outside." The act of consciously bringing in objects, such as tools, for the specific purpose of showing them to the other jurors during deliberations constitutes the obtaining of extraneous information from a non-evidentiary source. We conclude that the wrenches were extraneous information.

■

Next, we must determine whether the extraneous information was actually *improperly brought* to the attention of the jury. There is no dispute that the wrenches were *actually* brought to the attention of the jury. Therefore, we need only to examine whether the wrenches were *improperly* brought to the jury. Information not on the record is not properly before the jury. *See Poh*, 116 Wis. 2d at 521-22, 343 N.W.2d at 115. It is

undisputed that these wrenches were not marked as exhibits during the trial and were not introduced into evidence. Consequently, we conclude the extraneous information was improperly brought to the attention of the jury.

The final question is whether this extraneous information was *potentially* prejudicial. "The level of prejudice required for purposes of determining competency under [§ ]906.06(2) is necessarily lower than prejudice needed to successfully impeach a verdict." *Messelt*, 185 Wis. 2d at 277, 518 N.W.2d at 241. We conclude that the wrench experiment was potentially prejudicial. The wrenches were not admitted into evidence during the trial. Although the chrome-plated gun was admitted into evidence, we do not know whether the chrome wrench was substantially similar to the chrome-plated gun. Further, the evidence is devoid of any stainless steel object, such as the second wrench. We conclude the wrenches were potentially prejudicial as that term is used for determining competency under § 906.06(2), STATS.

In sum, we are convinced that the testimony, via the juror affidavits regarding the wrench experiment, is competent and, therefore, admissible in considering whether to impeach the verdict. Our final step in the analysis is to consider whether the wrenches in the jury room raise a reasonable possibility that a hypothetical jury could be prejudiced in reaching a verdict. Whether prejudice exists is a legal question which we review *de novo*. *Poh*, 115 Wis. 2d at 523, 343 N.W.2d at 116. We conclude that in view of the totality of the circumstances in this case, the wrench experiment would not possibly prejudice a hypothetical jury.

In this case, both victims positively, and with great certainty, identified Eison as the robber. Both victims testified that they clearly saw his face and that he had a gun. Lonteen was formerly employed as a security guard where he was trained in remembering facial features. Further, neither victim testified with certainty as to the type of finish of the gun, but both victims saw *a* gun. Given the strength of the identification evidence, and the insignificance of the type of finish of the gun, we conclude the wrench experiment could not possibly prejudice a hypothetical jury. Therefore, we conclude that the verdicts would have been the same even if this experiment had not been conducted, *see State v. Dyess*, 124 Wis. 2d 525, 543-45, 370 N.W.2d 222, 230-32 (1985) (stating test for harmless error), and we affirm the trial court.

*By the Court.*—Judgments affirmed.

FINE, J. (*concurring*). The majority opinion correctly recognizes that under *State v. Messelt*, 185 Wis. 2d 255, 282, 518 N.W.2d 232, 243 (1994), a defendant in a criminal case must "prove by clear, satisfactory and convincing evidence that there is a reasonable possibility that the extraneous information would prejudice a hypothetical average jury." Majority Op. at 305. *Messelt*, however, is at odds with prior supreme court precedent, *State v. Poh*, 116 Wis. 2d 510, 526–532, 343 N.W.2d 108, 117-120 (1984), which adopted the test for constitutional error enunciated in *Chapman v. California*, 386 U.S. 18 (1967), and held that the State must prove beyond a reasonable doubt that the extraneous information did not contribute to the verdict finding the defendant guilty. *See Poh*, 116 Wis. 2d at 532, 343

309

N.W.2d at 120 ("[W]e conclude that we cannot declare . . . that the state has demonstrated beyond a reasonable doubt that [the extraneous prejudicial] information did not contribute to the verdict."); *see also State v. Barthels*, 166 Wis. 2d 876, 894–895, 480 N.W.2d 814, 822 (Ct. App. 1992) (applying *Poh*'s beyond-a-reasonable-doubt standard), *aff'd*, 174 Wis. 2d 173, 495 N.W.2d 341 (1993).

In light of the conflict between the supreme court decisions in *Poh* and *Messelt*, and because the dissent in *Messelt*, 185 Wis. 2d at 284–288, 518 N.W.2d at 244-245, did not refer to the heightened test in *Poh*, I conclude that *Poh*'s placement upon the State of the burden of proving beyond a reasonable doubt that the extraneous prejudicial information did not contribute to the verdict has been overruled *sub silentio*.[1] We have, appropriately, applied the standard adopted by *Messelt. See State v. Clark*, 179 Wis. 2d 484, 493, 507 N.W.2d 172, 175 (Ct. App. 1993) (When decisions of the supreme court are inconsistent, we must follow the court's most recent analysis or pronouncement.).

---

[1] Significantly, the dissent in *Messelt* was written by Justice Shirley S. Abrahamson, the author of *Poh*. If the majority in *Messelt* had unknowingly ignored *Poh*'s holding, she would have, undoubtedly, pointed it out.