STATE of Wisconsin, Plaintiff-Respondent,

v.

Winston B. EISON, Defendant-Appellant-Petitioner.

Supreme Court

*Nos. 93–3144–CR, 93–3145–CR, 93–3146–CR, 93–3147–CR.*
*Oral argument May 26, 1995.—Decided June 22, 1995.*

(Also reported in 533 N.W.2d 738.)

161

166

For the defendant-appellant-petitioner there were briefs by *Scott B. Taylor* and *Lucas & Wilkoski,* West Allis and oral argument by *Scott B. Taylor.*

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

SHIRLEY S. ABRAHAMSON, J. Winston B. Eison, the defendant, seeks review of a published decision of the court of appeals, *State v. Eison,* 188 Wis. 2d 298, 525 N.W.2d 91 (Ct. App. 1994), affirming the judgments of conviction and the denial of his post-conviction motion by the circuit court for Milwaukee county, Stanley A. Miller, circuit judge. We affirm the decision of the court of appeals.

The single issue presented in this case is whether the defendant is entitled to a new trial on the grounds that jurors were prejudiced by extraneous information. The information to which the defendant refers is the jury's experimentation with wrenches that a juror brought into the jury room during deliberations. We conclude that the defendant is not entitled to a new

167

trial because the information, while competent and admissible under sec. 906.06(2), Stats. 1991–92, did not constitute prejudicial error.

## I.

The facts giving rise to this claim are uncontested for the purpose of this review.

On February 21, 1992, Larry D. Fielder was robbed at gun point as he crossed the yard behind his house. Fielder identified the defendant from two police line-ups and testified at trial that he recognized the defendant easily because of the "unusually round" shape of his face, the distinctive unshaven area on his face, and his close-set eyes. Fielder testified that he was able to get a "very good look" at Eison's face because of illumination from a street light, even though the defendant wore a dark hood pulled tightly around his face. Fielder also testified that he was "[t]otally certain" that he recognized Eison because of Eison's soft voice. Finally, Fielder testified that Eison brandished a "silver-colored" pistol. When questioned further about the gun, Fielder testified that if he had to guess, he would describe the gun as "nickel plated or a brushed finish."

On February 24, 1992, Mark Lonteen attempted to deliver pizzas to an apartment building when a man whom Lonteen assumed was the person who ordered the pizzas approached Lonteen wearing a dark hood pulled tightly over his head. Lonteen testified that after a few minutes of conversation, the man pointed a gun at him and told him to leave the pizzas and any money he had. Four days later, Lonteen identified the defendant from two different line-ups as the man who robbed him. Lonteen testified that when he viewed the first line-up, he was "very certain" of his identification

168

of the defendant. The second line-up made him "even more certain" that he had accurately identified the defendant. Lonteen testified that he had a good opportunity to view the defendant's face because before the defendant produced the gun they conversed for approximately three or four minutes under ample street lighting standing about two and one half feet apart from each other. He also testified that his two years as a security guard at a large retail store had honed his skills for identifying faces and observing other distinctive features of different people. Finally, Lonteen testified that the defendant's gun was silver and shiny.

On February 27, 1992, Police Officer James Ortiz noticed a man hiding in the bushes on the block where Lonteen was robbed. Officer Ortiz testified that the man was the defendant and that he was in possession of a small silver gun later identified as a chrome-plated .22 caliber handgun.

Following a jury trial, the defendant was convicted on February 11, 1993, of obstructing an officer and being a felon in possession of a firearm, as well as two counts of armed robbery, in violation of sec. 943.32(1)(b) and 943.32(2).[1]

---

[1] These charges resulted in two separate cases against the defendant that were joined in this jury trial. In addition to these two cases, the defendant had earlier pleaded guilty to charges in two other cases. The court of appeals consolidated all four cases. Although the issue before us stems from the charges resolved in his jury trial, the defendant appeals from all convictions. He contends that the convictions based on his guilty pleas should be vacated and remanded because the sentences imposed are inextricably intertwined with the sentences for the convictions at issue in this case. We do not reach this issue because we affirm the convictions entered on the jury verdict.

169

After the conclusion of the trial, the defendant discovered an incident which he claims constituted improper jury experimentation. At some point during the three days of jury deliberation, a juror brought two wrenches from home into the jury room and displayed them before the other jurors. One of the wrenches had a chrome finish, the other a stainless steel finish. The jury examined the respective colors of the wrenches and turned off the lights in the jury room to determine if the wrenches could be distinguished in the dark.

The defendant filed a post-conviction motion for a new trial on September 27, 1993. In support of his motion, Eison submitted the sworn statements of six jurors recounting the experimentation with the wrenches.[2]

Both parties agreed to submit the issue to the circuit court based on the affidavits alone, without taking testimony from any of the jurors and without examining the wrenches. After a hearing on November 10, 1993, the circuit court denied the defendant's motion, determining that the wrenches did not have a prejudicial effect on the jury's verdict.

The defendant filed a notice of appeal on November 24, 1993, appealing the judgments of conviction and the denial of his motion for post-conviction relief. The court of appeals determined that the wrench experiment was extraneous information and potentially prejudicial under sec. 906.06(2). Improperly

---

[2] The jurors' affidavits also stated that during the deliberations, a male juror pulled a hood over his head so the other jurors could attempt to discern his facial features. The defendant argued in the circuit court and the court of appeals that this event also constituted an improper jury experiment. He did not renew this argument before this court, and we do not consider it.

placing the burden of proof on the defendant, the court of appeals concluded that the defendant failed to prove a reasonable possibility that the extraneous information could have prejudiced the verdict of a hypothetical average jury.

## II.

■

A circuit court invokes its discretion in resolving a defendant's motion for a new trial. An appellate court will not overturn the circuit court's decision unless the circuit court erroneously exercised its discretion. *After Hour Welding,* 108 Wis. 2d 734, 740–41, 324 N.W.2d 686 (1982). When a motion for a new trial is based on extraneous information improperly brought to the attention of the jury, the circuit court must, in reaching its decision on the motion, decide underlying issues of both fact and law. A circuit court's erroneous view of the facts or the law constitutes an erroneous exercise of discretion. *Jesse v. Danforth,* 169 Wis. 2d 229, 246, 485 N.W.2d 63 (1992). An appellate court will affirm a circuit court's decision when the record shows that the circuit court looked to and considered the facts of the case and arrived at a conclusion consistent with applicable law. *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). We apply this standard of review in this case.

At the hearing on the motion for a new trial in this case, sec. (Rule) 906.06(2), Stats. 1991–92, governs the admissibility of statements made by a juror or matters occurring during the jury's deliberation. The Rule provides as follows:

(2) INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or

171

indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received. (Emphasis added.)

The analytical framework to be used under sec. (Rule) 906.06(2) to determine whether a party is entitled to a new trial on the grounds that jurors were prejudiced by extraneous information is clearly set forth in prior cases. *Castaneda v. Pederson,* 185 Wis. 2d 199, 518 N.W.2d 246 (1994); *State v. Messelt,* 185 Wis. 2d 254, 518 N.W.2d 232 (1994); *State v. Poh,* 116 Wis. 2d 510, 343 N.W.2d 108 (1984); *After Hour Welding,* 108 Wis. 2d 734. Initially, the party seeking to impeach the verdict must demonstrate that a juror's testimony is admissible under sec. 906.06(2) by establishing (1) that the juror's testimony concerns extraneous information (rather than the deliberative process of the jurors), (2) that the extraneous information was improperly brought to the jury's attention, and (3) that the extraneous information was potentially prejudicial. *Castaneda,* 185 Wis. 2d at 209 (quoting *Poh,* 116 Wis. 2d at 520). After the circuit court determines whether the party has satisfied sec. 906.06(2), it deter-

mines whether one or more jurors engaged in the alleged conduct and whether the error was prejudicial.

In this case, the circuit court did not delineate its rationale for finding that the experimentation was extraneous information improperly brought to the jury's attention under sec. 906.06(2) because the state apparently conceded at the hearing on the defendant's motion for a new trial that the wrench experiment resulted in extraneous potentially prejudicial information being improperly brought to the jury's attention. Accordingly, we independently review the record to determine whether it provides a basis for the circuit court's implicit determination that the experimentation constituted extraneous, potentially prejudicial information improperly brought to the jury's attention. *State v. Pharr,* 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983).

The first determination the circuit court should have made was whether the proffered evidence concerning the jurors was competent to be considered in an inquiry into the validity of the verdict, an evidentiary issue governed by sec. (Rule) 906.06(2). In other words, at the hearing on the motion for a new trial in this case the circuit court should have evaluated whether the sworn statements of the jurors were admissible as extraneous, potentially prejudicial information that was improperly brought to the jury's attention.

Extraneous information improperly brought before a jury jeopardizes a defendant's constitutional right to trial by an impartial jury, right to counsel and right to confrontation. The risk stems from the possibility that a defendant's conviction rests on information not part of the evidence offered in the courtroom under

the rules of evidence and under the supervision of the court. Section 906.06(2) seeks to protect a defendant's interest in a fair trial while at the same time protecting the finality of verdicts and the integrity of a jury. *Castaneda,* 185 Wis. 2d at 209; *Poh,* 116 Wis. 2d at 517, 519. Section 906.06(2) achieves an equilibrium by prohibiting a juror's testimony as to the deliberative process of the jury but allowing a juror's testimony regarding whether extraneous and potentially prejudicial information was improperly brought to the jury's attention.

The state now maintains that the wrench experiment did not provide extraneous information, but that the wrenches merely served as a surrogate for the defendant's gun which had been admitted into evidence. The gun was admitted as evidence on the charge of possession of a firearm by a felon but was not sent into the jury room; the gun was not linked to the armed robbery charges. Because the gun was evidence legitimately before the jury, the state argues that the wrenches can also be considered as serviceable surrogates for the finish on the gun.

We disagree with the state's position. We conclude that the affidavits concerning the wrench experiment relate to extraneous information. "Extraneous information" is information that is not of record and is not part of the general knowledge we expect jurors to possess. *Castaneda,* 185 Wis. 2d at 209; *Poh,* 116 Wis. 2d at 521. It is information that a juror obtains from a non-evidentiary source. *Messelt,* 185 Wis. 2d at 275. Extraneous information, in contrast with the commonly known facts and experiences we expect jurors to rely on in reaching their verdict, comes "from the outside."

174

*State v. Shillcutt,* 119 Wis. 2d 788, 789, 350 N.W.2d 686 (1984).

The wrenches were not admitted in evidence, nor did the wrench experiment draw on the general knowledge or wisdom that jurors are expected to bring to their deliberations. The wrenches were items brought in the jury room "from the outside." *Shillcutt,* 119 Wis. 2d at 794 (defining "extrinsic" as something "existing or originating outside or beyond: external in origin: coming from the outside"). We recognize that jurors are permitted in their deliberations to use common experiences in reaching their verdict. Nevertheless, when a juror intentionally brings into the jury room items not in evidence and items that jurors do not ordinarily have on their person, we must conclude that the jury was exposed to extraneous information.

We further conclude that this extraneous information was improperly brought to the jury's attention. "Information not on the record is not properly before the jury." *Castaneda,* 185 Wis. 2d at 210; *Poh,* 116 Wis. 2d at 521–22.

Finally, we conclude that the extraneous information was potentially prejudicial. The determination of potential prejudice required under sec. 906.06(2) is necessarily lower than that needed to successfully impeach the verdict. *Castaneda,* 185 Wis. 2d at 210; *Messelt,* 185 Wis. 2d at 276. Nonetheless, the state contends that the defendant must identify the information that the wrench experiment imparted to the jurors to illustrate that the information was potentially prejudicial. Because the defendant has not done so, the state

175

argues that the information could not have been potentially prejudicial.

The state errs in suggesting that the defendant is required to identify the results of the wrench experiment. Each juror may have had a different perception of the colors reflected from the different finishes of the wrenches. To inquire about the jurors' interpretations of the results of the wrench experiment would improperly invade the mental process of the jury, resulting in incompetent evidence according to sec. 906.06(2).

To find the extraneous information potentially prejudicial as that phrase is used for determining competency under sec. 906.06(2), it is sufficient that it conceivably related to the issue of the victims' identifications of the defendant, a central issue of the trial. One victim, Fielder, testified at trial that the gun used in the armed robbery had a brushed finish while the other victim, Lonteen, testified at trial that the gun aimed at him had a shiny finish. When the police arrested the defendant, he was carrying a chrome-plated gun. Consequently, the wrench experiment was potentially prejudicial because it could have influenced the jury's evaluation of the witnesses' identifications of the defendant as the man who committed the armed robberies.

Because the wrench experiment produced extraneous and potentially prejudicial information improperly brought to the jury, we conclude, as the circuit court implicitly concluded, that the affidavits of the six jurors constitute *competent* testimony admissible under sec. 906.06(2).

Once the determination is made that a juror's testimony is competent and admissible under sec. 906.06(2), the circuit court must then make a factual and a legal determination. The circuit court must be persuaded by clear and satisfactory evidence that one or more jurors engaged in the alleged conduct. *Castaneda,* 185 Wis. 2d at 211; *Messelt,* 185 Wis. 2d at 281; *Poh,* 116 Wis. 2d at 523; *After Hour Welding,* 108 Wis. 2d at 742. If the circuit court makes the factual finding that one or more jurors engaged in the alleged conduct, the circuit court must then determine, as a matter of law, whether the extraneous information constituted prejudicial error requiring reversal of the verdict. *Castaneda,* 185 Wis. 2d at 211–12; *Messelt,* 185 Wis. 2d at 281–82.

The affidavits of six jurors described the wrench experiment. The state does not dispute the fact that a juror brought two wrenches into the jury room and that several or all the jurors performed experiments with the wrenches. Because the parties agreed that one or more jurors experimented with the wrenches, the circuit court did not make an express finding of fact that the jurors engaged in the alleged conduct. Our independent review of the record, however, reveals a basis for the circuit court's implicit determination that the defendant proved by clear and satisfactory evidence that one or more jurors engaged in the conduct alleged.

In the final step of the inquiry, the circuit court must assess, as a matter of law, whether the conviction must be reversed because there is a reasonable possibility that the wrench experiment would have had a prejudicial effect upon a hypothetical average jury. *Messelt,* 185 Wis. 2d at 282; *Poh,* 116 Wis. 2d at 525.

The court has adhered to the constitutional error test for criminal cases enunciated in *Chapman v. California,* 386 U.S. 18 (1967), namely, that the state "must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Poh,* 116 Wis. 2d at 529. We apply this constitutional error test in the case at bar.

We stress the state's burden of proof because the court of appeals incorrectly placed the burden on the criminal defendant to prove by clear, satisfactory, and convincing evidence that there is a reasonable possibility that the extraneous information would prejudice a hypothetical average jury. *Eison,* 188 Wis. 2d at 305.[3] Although applying the wrong standard, the court of appeals correctly affirmed the circuit court.

The circuit court and the court of appeals concluded that the extraneous information could not have had a prejudicial effect on a verdict rendered by a hypothetical average jury. This court independently reviews the determination of prejudice, *Messelt,* 185 Wis. 2d at 281–82; *Poh,* 115 Wis. 2d at 523. We may benefit, however, from the analyses of the circuit court and court of appeals.

---

[3] The concurrence in the court of appeals' *Eison* case explains that the test used originated in the *Messelt* case and that this *"Messelt* test" is at odds with the burden of proof test set forth in *Poh. See Eison,* 188 Wis. 2d at 309 (Fine, J. concurring).

Although the concurrence's interpretation of *Messelt* in the court of appeals is favorable to the state, the state disavowed this interpretation of *Messelt.* We agree with the state. *Messelt* did not alter *Poh.*

To determine the possibility of prejudice we consider factors such as the nature of the extraneous information, the circumstances under which it was brought to the jury's attention, the nature and character of the state's case and the defense presented at trial, and the connection between the extraneous information and a material issue in the case. *Castaneda,* 185 Wis. 2d at 212–13; *Poh,* 116 Wis. 2d at 530; *After Hour Welding,* 108 Wis. 2d at 742. Based on a consideration of these factors in totality, we conclude that the error was harmless beyond a reasonable doubt. We have three reasons for reaching this conclusion.

First, both victims were sufficiently persuasive to allow the jurors to conclude that the defendant was the assailant. At two line-ups, Fielder recognized the defendant as the man who robbed him. Fielder testified that he got a "very good look" at the man who stole his wallet at gun point. He stated that, even though the man wore a hood pulled tight, he observed his assailant's face from about three feet away and that it was fully illuminated by a nearby light. Fielder further testified that he was "[t]otally certain" that his identification of the defendant was correct because he remembered the "unusually round" shape of his face, the distinctive unshaven area on his face, his close-set eyes, and his soft voice.

Mark Lonteen also provided an unequivocal identification of the defendant as the man who robbed him. Lonteen, before realizing the man was armed, conversed with him for several minutes under ample street lighting with a distance of only two and one half feet between them. Despite the fact that the robber wore a hood pulled tightly around his head, Lonteen easily identified the defendant as the assailant from

two line-ups held four days after the robbery. Lonteen testified that he was "very certain" the defendant was the assailant, and that his two years as a private security guard trained him to take note of faces and other distinctive features.

Second, the victims' descriptions of the weapon used in the robberies were substantially similar, not significantly different. Both victims testified that the gun was "silver." Fielder, when asked to say definitively that the gun was not chrome, testified that it was "a fine point. . . . It was not a blue gun, it was not a black gun. I could not say it was a chrome gun." After further questioning about the gun, Fielder responded "my interest at that point mainly centered on the fact that it was a gun." Lonteen described the gun as shiny silver, but then said "I'm not a hundred percent, and I don't know guns."

Third, other evidence serves to bolster the victims' unequivocal identifications of the defendant. The two robberies occurred only three days apart. In both robberies, the perpetrator wore a dark hood pulled tightly around his head and brandished a small silver gun. Three days after the second robbery, a police officer apprehended the defendant, in possession of a small silver gun, on the same block on which Lonteen was robbed.

Despite the evidence against him, the defendant claims that the extraneous information gleaned from the wrench experiment would have prejudiced the verdict of a hypothetical average jury.[4] He contends that

_____

[4] Eison also claims that the extraneous information violated a criminal defendant's constitutional right to trial by an impartial jury, the right to be present during the proceedings and his right to be represented by an attorney. Although the error of extraneous information in a criminal trial may impli-

this information is directly related to the material issue of identifying him as the armed robber. According to the defendant, the state constructed its case solely around the two victims' identifications of him as the assailant, while he based his defense on the grounds that the victims had misidentified him. Additionally, the defendant notes that the jury deliberated for nearly three full days and twice sent messages to the circuit judge indicating the jurors' inability to reach a unanimous decision. The defendant implies that the jury was deadlocked over the issue of identification, rendering the wrench experiment all the more prejudicial.

Given the identification evidence, the similarity between the victims' descriptions of the gun and the totality of the circumstances we conclude, as did the circuit court and the court of appeals, that there is no reasonable possibility that the verdict of a hypothetical average jury would have been influenced by the extraneous information improperly brought to the jury's attention. Because the jurors were not prejudiced by the extraneous and potentially prejudicial information improperly brought to the jury's attention, the defendant is not entitled to a new trial. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

cate the defendant's constitutional rights, reversal is not mandated unless the error is prejudicial. *Poh,* 116 Wis. 2d at 526. Because we find the error in this case not to be prejudicial, we do not explore Eison's constitutional claims.